# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STEVEN IOVINELLI,

    Plaintiff,

      v.

DANIEL B. PRITCHETT, DAVID J.
TRAIFOROS, and the VILLAGE OF
FRANKLIN PARK, ILLINOIS,

    Defendants.

No. 06 C 6404
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND

Plaintiff Steven Iovinelli, a firefighter in the Franklin Park Fire Department, has filed a claim for declaratory judgment, injunctive relief, and compensatory and punitive damages against the Village of Franklin Park, Illinois, the Village President Daniel B. Pritchett, and the Department Chief David J. Traiforos, alleging violations of 42 U.S.C. § 1983. This case arises out of a series of allegedly retaliatory employment actions taken against Iovinelli as a result of his challenge to the administration of the Village's Firefighters' Pension Fund while he served as a member of the Village's Firefighters' Pension Board.

In January, 2002 Iovinelli filed a lawsuit in state court against the Village, in which Iovinelli claimed the Village diverted pension fund taxes from the Fund for various political purposes. Iovinelli now claims he has been retaliated against for pursuing that case against the Village. Counts I, II, and III allege First Amendment retaliation, denial of due process, and violation of Equal Protection against all three Defendants. Iovinelli seeks injunctive relief and estoppel in Counts IV and V, where he asks this Court to (1) reinstate him as ladder truck

company captain at Station 2; (2) enter a preliminary injunction ordering him elevated to the rank of shift commander *pendente lite*; and (3) order Defendants to promote him to the position of shift commander when the next opening occurs. Iovinelli additionally seeks back pay and other damages retroactive to June 2003, compensatory damages, attorneys' fees, and punitive damages against Pritchett and Traiforos in their individual capacities.

The Village has filed a 12(b)(6) motion to dismiss, arguing that (1) the action is barred under the doctrine of *res judicata*; (2) certain allegations in Plaintiff's Complaint are barred under the doctrine of collateral estoppel; (3) Plaintiff's claims must be dismissed because Plaintiff has available state and other remedies; (4) Plaintiff's claims are based solely on the inapplicable doctrine of respondeat superior; (5) Plaintiff's § 1983 claims are barred by the statute of limitations; (6) Plaintiff's speech is not protected by the First Amendment; (7) Plaintiff does not have a protectible property interest in his promotion to the rank of shift commander; (8) Plaintiff is not a member of a protected class for purposes of Equal Protection; and (9) Plaintiff cannot obtain injunctive relief. Defendants Pritchett and Traiforos have each filed 12(c) motions for judgment on the pleadings, arguing basically the same points made in the Village's motion and alternatively claiming qualified immunity from damages because the law was not clearly established when the alleged adverse employment actions were taken. Because of the overlapping facts and intertwined legal issues, I address all three motions here. For the following reasons, the Village's motion is granted in part and denied in part. Pritchett's and Traiforos' motions are similarly granted in part and denied in part.

## II. STANDARDS OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). The Village's motion to dismiss should be granted only if Iovinelli cannot prove any set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Furthermore, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences from those facts in Plaintiff's favor. *Cleveland v. Rotman*, 297 F.3d 569, 571 (7th Cir. 2002). Stated another way, I should not grant the Village's motion "unless no relief could be granted 'under any set of facts that could be proved consistent with the allegations.'" *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). That said, Iovinelli's "obligation to provide the grounds of his entitlement for relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).

Rule 12(c) permits a party to move for judgment after the parties have filed the complaint and the answer. Fed. R. Civ. P. 12(c). On a Rule 12(c) motion, I accept as true all well-pleaded material allegations of the non-movant. *Cagan v. Interest Midwest Real Estate Corp.*, 774 F.Supp. 1089, 1091 n. 2 (N.D. Ill. 1991). I review 12(c) motions under the same standard as 12(b) motions to dismiss.[1] *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d

---

[1]Both motions permit a party to request the district court to dispense of the matter at the initial stage of the proceedings. The primary difference between these motions is that a party may file a 12(b) motion before its answer. "A motion making any of these defenses [12(b)(1)-(7)] shall be made before pleading if a further pleading is permitted." Fed.R.Civ.P. 12(b). A party may move to dismiss the claim under Rule 12(c) "[a]fter the pleadings are closed

449, 452 (7th Cir. 1998). Judgment on the pleadings is appropriate when, based on the facts admitted, no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law. *Cagan*, 774 F.Supp. at 1091. The pleadings include the complaint, the answer, and any written instruments attached as exhibits. Fed.R.Civ.P. 10(c); *N. Ind. Gun & Outdoor Shows, Inc.*, 163 F.3d at 452.

Iovinelli opposes on foundation grounds the consideration of the three collective bargaining agreements and a compilation of purported rules and regulations from July 10, 1998, which are attached to Pritchett's motion. Iovinelli contends that the inclusion of these documents converts Pritchett's motion into a Rule 56 motion for summary judgment. Indeed, Rule 12(d) provides that if the court considers "matters outside the pleadings", a Rule 12(b)(6) or Rule 12(c) motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(d). However, a narrow exception to this rule permits this court to take judicial notice of matters of public record without converting a motion for failure to state a claim into one for summary judgment. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). I may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either (1) "generally known within [this] territorial jurisdiction, or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). I may take judicial notice of matters of public record, including "state statutes, city charters, and city ordinances." *Demick v. City of Joliet*, 108 F.Supp.2d 1022, 1025 (N.D. Ill. 2000). In this case, the 1998 rules and regulations of the Village's Fire Department, adopted by the Village and approved by the Village Board of Trustees, as well as the 1998, 2001, and 2005

---

but within such time as not to delay the trial." Fed.R.Civ.P. 12(c).

collective bargaining agreements, negotiated between the union and the Village, authorized by the Village Board of Trustees, and executed by the Village President, are proper subjects for judicial notice because they have been duly promulgated and are matters of public record.  *See Driebel v. City of Milwaukee*, 298 F.3d 622, 630, n.2 (7th Cir. 2002) (court judicially noticed duly promulgated Milwaukee Police Department Manual of Rules and Regulations).

Also, Rule 12(c) permits me to consider documents attached to the pleadings.  *Baker v. Potter*, 175 Fed.Appx. 759, 762 (7th Cir. 2006).  The Rule, which is permissive in nature and has historically been interpreted broadly by the Seventh Circuit, provides that a "copy of any written instrument which is an exhibit to a pleading is part thereof for all purposes."  Fed. R. Civ. P. 10(c); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  Although Iovinelli was under no obligation to attach to his complaint documents on which his action is based, Defendants may introduce pertinent documents as attachments to their motions.  *Venture Associates*, 987 F.2d at 431.  The collective bargaining agreements and rules and regulations that Pritchett attached to his motion are central to Iovinelli's claim because they govern the terms and conditions of Iovinelli's employment with the Village.  Therefore, I consider those documents along with the pleadings in my rulings here.

Incidentally, this Court can also take judicial notice of the decisions of federal and state courts.  *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 607 n.30 (7th Cir. 1993).  The parties have filed several motions inviting my attention to supplemental authority, including caselaw, which I have judicially noticed.

## III. FACTS

Plaintiff alleges the following basic facts, which must be accepted as true for purposes of Defendants' motions:

Plaintiff Steven Iovinelli has worked as a firefighter in the Franklin Park Fire Department since 1980. By all accounts Iovinelli has been an outstanding employee throughout his tenure at the Department. The ranks at the Department progress from firefighter, to lieutenant, to captain, to shift commander, and then to chief. Iovinelli rose through the ranks in the Department and was promoted to captain in 1997. As captain, Iovinelli simultaneously achieved the rank of acting shift commander, a position that entails assuming command responsibilities whenever the appointed shift commander is absent. Those responsibilities include fire and emergency incident command and managing firefighters and paramedics on duty during a 24-hour shift.

In addition to his duties as captain, Iovinelli completed a number of technical training programs which qualify him for special duties. These include Fire Officer I, Fire Officer II, Hazardous Material Incident Commander/Tech B, Incident Safety Officer, WMD Technician, Instructor III, and Fire Prevention Officer. Iovinelli's expertise in automobile extrication and roof ventilation has been recognized outside the Department, where he has been called upon to teach courses to firefighters in other areas of the Division. In his part-time employment, Iovinelli serves as deputy chief of the River Grove Fire Department. He is also a member of the Division 20 Hazardous Materials Team and part of the statewide WMD Response force. He was recently appointed a Primary Advisor on the National Fire Protection Association's Technical Committee 385, which reviews national standards governing the transportation of flammable liquids. All of these qualifications render Iovinelli an adept member of the Franklin Park Department.

Defendant David J. Traiforos is the Chief of the Franklin Park Fire Department. Traiforos became Chief in 2000. As Chief, Traiforos is a final policy-making official of the Village with respect to the selection of shift commanders and other officer assignments within the Department. Traiforos consistently gave Iovinelli high reviews for his performance in the Department, including on his recent August 2006 evaluation. That evaluation indicates outstanding or exceeding expectations in every category.

Defendant Daniel Pritchett is the Village President and also a final policy-making official of the Village with respect to terms and conditions of employment within the Department that are not regulated by statute or ordinance, by the collective bargaining agreement, or by rules and regulations promulgated for the Department.

Defendant Village is a municipality located in Cook County, Illinois.

Iovinelli and William G. Horn, a fellow firefighter in the Department, were elected to the Franklin Park Firefighters' Pension Fund's board of trustees in 1997 and 1990, respectively.[2] While serving as a trustee, Iovinelli discovered certain unlawful practices on behalf of the Village regarding contributions to the Fund. In 1997, the Illinois Department of Insurance ("DOI") reported to the Pension Board that the Village was withholding hundreds of thousands of dollars of real estate taxes that should have been remitted to the Fund, as well as a portion of personal property replacement taxes. The DOI issued similar reports over the next several years. In the fall of 1998, Iovinelli and Horn, who was then president of the Board, repeatedly urged the Board to take action to redress the ever-increasing underfunding. According to Iovinelli,

---

[2]This was Iovinelli's second tenure on the Board. He had previously served as trustee between 1983 and 1988.

7

Pritchett opposed and resisted any action that would cause the Village to change its practices because the diversion of taxes from the Fund amounted to an interest-free loan which Pritchett could use for various political benefits. Iovinelli claims that Pritchett not only mislead taxpayers, but he violated his fiduciary duty as trustee when he advanced his own political interests over the financial security of the firefighters. Pritchett and other ex officio members of the Board within his influence, says Iovinelli, agreed to not attend meetings in order to defeat a quorum and generally blocked any efforts to investigate the cause of the underfunding. In 2000, the Board made a written demand that the Village pay $4 million to the Fund out of an alleged $14 million surplus collected from a municipal utility user tax. A few months later the Village paid about $130,000 into the Fund.

Iovinelli served as a firefighter in the Department without incident until he began to voice concerns over the Village's funding practices. Iovinelli alleges that as he continued to pursue efforts to remedy the possible underfunding, he faced a series of retaliatory actions initiated by Pritchett and implemented by Traiforos. The first retaliatory act occurred when Pritchett told Traiforos to remove Iovinelli as training officer. Traiforos initially resisted, but on September 20, 2001, Traiforos announced in front of the entire Department that Iovinelli would be stripped of his training officer responsibilities.

By January 2002, the Fund had accumulated over $8 million in unfunded liabilities and, as a result, the Board was unable to obtain to liability insurance. Faced with continued opposition from Pritchett and the other ex officio members of the board, Iovinelli and Horn decided to pursue the matter in state court. On January 30, 2002, Iovinelli and Horn filed a state court action against the Village in the Circuit Court of Cook County pursuant to the authority of

Section 1-115 of the Illinois Pension Code, which authorizes civil actions brought by "the Attorney General, participant, beneficiary, or fiduciary," for the purposes of enjoining or seeking other relief to redress any violations of the Pension Code. 40 ILL. COMP. STAT. 5/1-115. The complaint alleged that the Village diverted pension fund taxes away from the Fund for improper political purposes in violation of the Illinois pension fund statute.

The litigation in the Circuit Court progressed for several years. In May 2003, during the briefing on the second motion to dismiss, the shift commander position became available in the Department. Iovinelli submitted his resume for the position, and he was the only one to do so, given that the senior ranking officer traditionally received the appointment. According to Iovinelli, in or around 1991, when the shift commander position was first created, the Village president and fire chief stated to the Department and the board of trustees that the position would always be filled by the senior ranking officer. Iovinelli alleges that Pritchett reiterated the policy to the Department over the years, and that Traiforos explicitly endorsed the policy when filling vacancies between 1996 and 2003. However, when the vacancy occurred in 2003, Iovinelli was not appointed to the position. According to Iovinelli, on June 3, 2003, Traiforos told him that Pritchett had ordered Traiforos to solicit other candidates for the position. Iovinelli believed that the process was a sham to conceal Pritchett's malicious intent to deny Iovinelli the shift commander promotion in retaliation for Iovinelli's involvement in the ongoing pension fund lawsuit in state court.

On June 27, 2003, Iovinelli had another conversation with the Chief in which Traiforos said he had recommended Iovinelli for the shift commander appointment. The vacancy was created by the retirement of Commander Jack Panzica, who also recommended Iovinelli as his

replacement. Pritchett allegedly responded to Traiforos' recommendation by holding up Iovinelli's resume in one hand and an invoice from the Village's litigation counsel in the other and saying, "This is why Captain Iovinelli will never be shift commander." The promotion to the shift commander position was eventually given to a junior officer who had no prior command experience.

As the pension fund litigation continued, Iovinelli was called into Traiforos' office for another meeting. Once there, Iovinelli allegedly learned that Pritchett was demanding that Iovinelli be removed as acting shift commander, despite the fact that Iovinelli had the most experience in the Department. Pritchett's demand was, according to Iovinelli's complaint, overruled by the Village attorney out of concern for liability. Iovinelli kept the position of acting shift commander and remained so for the next year.

The Circuit Court order ultimately disclosed that the Village had indeed met its legal funding obligations, save $42,481.67 of interest owed on untimely payments, which appeared to be the result of the complexity of the accounting process. The Court found that no monies were diverted for Village use that should have been paid into the Fund.

The Circuit Court's order was sent by mail and received by counsel for each party on September 7, 2005, or later. On September 9, 2005, in what seemed to be a favorable turn of events, Traiforos elevated Iovinelli to the position of shift commander to cover the extended medical leave of the commander at that time. However, on September 19, 2005, Traiforos informed Iovinelli that Pritchett had been on vacation when the order in the pension fund case was received. Upon learning of the outcome and of Iovinelli's interim promotion, Pritchett was livid and demanded that Traiforos replace Iovinelli immediately. Three weeks later, Traiforos

told Iovinelli that Pritchett had "started a file" on Iovinelli and warned Iovinelli that Pritchett "is gunning for you," or words to that effect.

Two months later, on December 9, 2005, Traiforos took payroll duties away from Iovinelli. When asked for a reason, Traiforos responded, "you know why." A week later Traiforos took all personnel and scheduling responsibilities away from Iovinelli, and he told Iovinelli that the decision to do so was made by Pritchett. On January 18, 2006, Traiforos told Iovinelli that Pritchett was still not satisfied and wanted Iovinelli relieved of all remaining responsibilities. Those included incident reporting and false alarm billing. Iovinelli was allowed to continue performing those tasks, but only, he alleges, so long as Pritchett did not find out about it.

Another ruling in the pension fund case was issued by the Circuit Court on January 30, 2006 and entered as an order on February 21, 2006. That order addressed the Village's motion to reconsider and for clarification. The Village was ordered to follow a prescribed formula in setting all future tax levies and to pay interest for past due non-compliant practices. Iovinelli petitioned for supplemental relief, which was granted in part on August 28, 2006. As the prevailing party, Iovinelli was awarded his costs and expenses ($18,000) for expert witness fees. The Circuit Court noted the benefits conferred by the litigation:

> Here, the result obtained . . . cannot be measured by the amount of money received by the fund because of untimely payments made to the Fund. Rather, the greater benefit is in the clarification of the process to be used, as well as the express requirement of timely payments. . . . Where a business or governmental agency either reduces or delays required payments to a pension fund, the fund not only loses the money during the time the obligation remains unfulfilled, but also loses the ability to invest those sums in order to increase the returns for the ultimate beneficiaries. This lack of

> compliance with contractual or statutory obligations unnecessarily
> increases the future liability of shareholders or taxpayers in
> geometric rather than arithmetic proportions.

Two weeks later, Traiforos announced that Iovinelli and Horn would be transferred from Station 2, the Department's headquarters, to Station 3, a single engine post on the outskirts of town, as of January 1, 2007. Iovinelli would be moved from ladder truck captain at Station 2 to engine officer at Station 3. Iovinelli considers such a move retaliatory and claims he has suffered severe emotional distress and professional humiliation as a result. Indeed, Defendants admit that the firefighter's union considers the reassignment to be punitive. The transfer precludes Iovinelli from applying for full-time command positions in other Departments because most, if not all, chief positions require applicants to have reached the minimum rank of shift commander.

On January 1, 2007, Iovinelli was involuntarily relegated to the position of engine officer at Station 3. Iovinelli filed a grievance to dispute the transfer to Station 3 in accordance with the terms of the collective bargaining agreement. At the time of briefing, the grievance was in its third stage, which mandates binding arbitration.

In December 2006, after this case was filed in federal court, Traiforos asked each of the current commanders to select his acting shift commander for 2007. Commander Chester Vandergriff at Station 2 selected Iovinelli. Accordingly, Iovinelli moved his gear back and forth between Station 3 and Station 2 when he "acted up" as shift commander in Vandergriff's absence. Since the briefing in this case was completed, Vandergriff retired and Iovinelli has been acting as the shift commander on what is known as the "Black Shift" at Station 2. Per this Court's instruction, the Department has agreed to maintain the status quo, *i.e.* take no action to

fill the vacancy for the position of shift commander without providing five days notice to Plaintiff's counsel.

Iovinelli alleges that the retaliation continued in other ways after this case was filed. Pritchett and a trustee named Lou Georgetta publicly impugned Iovinelli's character and leadership abilities. Traiforos also called Iovinelli's character into question in front of an audience of various chiefs and fire officers in the Division, including Iovinelli's commanding officers in the River Grove Fire Department.

Iovinelli turned 52 in March 2008. He believes there is a finite span of time in which he can acquire the necessary rank and experience to ever be considered for hire as a full-time chief or deputy chief outside of Franklin Park.

## IV. ANALYSIS

### A. Res Judicata

The Village, Pritchett, and Traiforos urge that the state court Pension Fund case has a res judicata effect on Iovinelli's federal civil-rights claims. Under the doctrine of res judicata, a final judgment rendered by a court of competent jurisdiction on the merits acts as a bar to a subsequent suit between parties involving the same cause of action. *Cole v. Bd. of Trustees of Univ. of Ill.*, 497 F.3d 770, 772 (7th Cir. 2007); *Ross ex rel. Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 282 (7th Cir. 2007) (*citing S. Pac. RR. Co. v. U.S.*, 168 U.S. 1, 33 (1897). Federal courts consistently apply res judicata to causes of action and issues decided by state courts. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 467 (1982). Under Illinois law, in order for res judicata to apply to Iovinelli's federal claims, the state court pension fund case must have: (1) reached a final judgment on the merits; (2) involved the same parties or their privies as the

current claims; and (3) constituted the same cause of action as the current claims.  *Garcia v. Village of Mount Prospect*, 360 F.3d 630, 635 (7th Cir. 2004); *River Park v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998).  Here, only the second two elements are at issue.

### 1. Same Parties or Their Privities

Iovinelli was the plaintiff in the pension fund case, and he is the plaintiff in this case as well.[3]  Therefore, the second element of res judicata is easily met with respect to Iovinelli.  There are three defendants in this case:  the Village, Pritchett, and Traiforos.  Only the Village was a named party in the pension fund case.  Hence, the second element of res judicata is clearly met with respect to the Village.  I must then consider whether Pritchett and Traiforos are in privity with the Village.

A government and its officers are in privity for purposes of res judicata.  *Mandarino v. Pollard*, 718 F.2d 845, 850 (7th Cir. 1983) (*citing Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402 (1940).  As Village President, Defendant Pritchett is in privity with the Village.  Iovinelli's addition of Pritchett and Traiforos in their individual and official capacities does not prevent satisfaction of this element of *res judicata.  See Licari v. City of Chicago*, 298 F.3d 664, 667 (7th Cir. 2002).

### 2. Same claims

The Supreme Court of Illinois adopted the "transactional test" to determine whether a prior claim constitutes the same cause of action as a current claim, and the Seventh Circuit has followed suit.  *River Park*, 703 N.E.2d at 893; *Manicki v. Zeilmann*, 443 F.3d 922, 924 (7th Cir.

---

[3]Iovinelli was actually a co-plaintiff in the pension fund case with plaintiff William G. Horn, a fellow firefighter in the Department and also a beneficiary and participant of the Fund. Iovinelli's status as co-plaintiff does not affect the res judicata analysis.

2006). Under that test, a claim "is the transaction or (equivalently) the operative facts that give rise to plaintiff's right to obtain legal relief, rather than the particular legal category or theory that shows that the transaction really does entitle him to a legal remedy." *Manicki*, 443 F.3d at 924 (internal quotations omitted). "Two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Id.* at 925 (*quoting Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223, 226 (7th Cir. 1993)). In *Manicki*, the court reasoned that the two separate clusters of facts from each of the plaintiff's two cases were really not separate because together they constituted the circumstances of Manicki's dismissal. *Manicki*, 443 F.3d at 925. One cluster of facts concerned the police board's denial of a predeprivation hearing and the other cluster was a retaliatory letter to the board that precipitated Manicki's dismissal. *Id.* Manicki wanted the hearing so that he could prove retaliation and thus his two claims - due process and retaliation - were "tightly bound together." *Id.* At 926. Additionally, the ultimate relief sought in each case included reinstatement, and the facts required for that remedy were the same. *Id.* at 925. *See also Cole,* 497 F.3d at 773 (subsequent case precluded by res judicata where plaintiff sought recovery for same injury and where both complaints alleged roughly the same series of events). *Manicki* also instructs "that the test for res judicata is not a genetic one," and that claims can "be litigated separately even though both have a common origin." *Id.* (citing as an example discrimination and retaliation claims that can be litigated separately even though both have a common origin in discrimination against the employee, unless, however, the same action is charged as both discrimination and retaliation).

In this case, Iovinelli's federal § 1983 claims will constitute the same cause of action as his pension fund case if they "arise from the same group of operative facts." *Garcia v. Village of*

*Mount Prospect*, 360 F.3d 630, 637 (7th Cir. 2004) (*quoting River Park*, 703 N.E.2d at 893).  An analysis of Iovinelli's § 1983 filing and his second amended complaint in the pension fund case reveals that the § 1983 claims arise from a different core of operative facts, namely the terms, conditions, and record of Iovinelli's employment with the Department over the past 26 years and specifically the time period surrounding the pension fund litigation.  The pension fund case did not concern Iovinelli's own employment history with the Department, beyond the extent to which his employment conferred standing upon him to bring the case.[4]

The Village relies on *River Park*, in which the court deemed the plaintiffs' state law claims barred by res judicata because those claims were merely a "substitution of labels" from a previous federal § 1983 claim.  *River Park*, 703 N.E.2d at 895.  The same characterization is untrue here.  Iovinelli's pending federal claims are not merely a substitution of labels from the previously litigated state court pension fund case.  His current claims do not involve the same set of facts under a different legal theory, but rather different facts altogether.  The pension fund case dealt with tax levy and collection issues, which are distinct from the employment and constitutional claims asserted here.  The terms and conditions of Iovinelli's employment with the Department, which are the operative facts in this case, were irrelevant in the pension fund case, except to the extent that they conferred Iovinelli's standing to bring the suit at all.  The operative

---

[4]Iovinelli's Verified Declaration attached to his Memorandum of Law in Opposition to the Village's Cross-Motion for Summary Judgment in the Pension Fund case does include facts about his employment with the Department and his role with the pension fund in paragraphs 21 - 28.  However, it is clear that the details were included in the Declaration for the purpose of showing Iovinelli's diligence in pursuing the underfunding controversy and alleging possible willful behavior on behalf of the Village that would tend to negate any claim of immunity.  The facts in these paragraphs merely supplement the core operative facts of the pension fund case.  They were not the focus of the prior litigation.

facts in the pension fund case were the transactions relating to the collection and remittance of pension fund taxes.

Moreover, in the pension fund case Iovinelli sought collective relief, including a declaratory judgment, an accounting, and restitution, for all of those affected by the alleged underfunding of the Franklin Park Firefighters' Pension Fund. Here, Iovinelli seeks personal damages and injunctive relief with regard to his personal employment in the Department. While the ultimate relief sought does not by itself determine whether res judicata bars a subsequent claim, it can be instructive as to the degree of overlap, if any, among the so-called "operative facts." There is certainly some relation between the pension fund case and this one, but not the type of overlap envisioned by the res judicata doctrine. It is clear that "the nature of the evidence needed to prove" the pension fund case is entirely different than that needed here. *River Park*, 703 N.E.2d at 893. Although some of the res judicata requirements are met, not all of the requirements are met for any of the parties or claims. Therefore, res judicata does not apply to Iovinelli's federal claims.

B.  Collateral Estoppel

The Village argues that "certain allegations" in Plaintiff's Second Amended Complaint are barred under the doctrine of collateral estoppel. In Illinois, the doctrine applies when "a party, or someone in privity with a party, participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." *Nowak v. St. Rita High School*, 757 N.E.2d 471, 477 (Ill. 2001).

The Village fails to identify which of Iovinelli's allegations in this case are contested on the basis of collateral estoppel. The Village's concern over relitigating issues that were presented and decided by the Circuit Court in the pension fund case is without merit. Clearly, Iovinelli has no desire to disturb the Circuit Court's rulings on any of the issues that resulted in the decree of future compliance that was ultimately ordered. The Village's collateral estoppel argument contains the same fatal flaw as its argument based on res judicata. The pension fund case dealt with tax levy and collection issues, which are distinct from the employment and constitutional claims asserted here. In this case, collateral estoppel clearly does not apply.

### C. State and Other Available Remedies

The Village argues that the existence of other adequate post-deprivation remedies at the state level satisfy due process such that Iovinelli's § 1983 claims are barred here. The Village vaguely points to the Illinois Administrative Review Act, 735 ILCS 5/3-101-113 (West 2002), which allows Iovinelli to ask for administrative review and to seek redress pursuant to the collective bargaining agreement between the Village and the firefighters.

Iovinelli responds that the collective bargaining agreement only provides a vehicle to challenge disciplinary actions and discharges before the Board of Fire and Police Commissioners. Since he has not been discharged and the actions taken against him cannot be considered "discipline" without either notice or written charges, he has no recourse via the collective bargaining agreement.

The Village's motion to dismiss on the grounds that Iovinelli has state and other available remedies must be denied. Iovinelli has begun the grievance procedure outlined in the collective bargaining agreement for what he believes was a punitive transfer to Station 2. But, the

agreement provides no process or relief for the constitutional violations alleged here. The tort-like damages Iovinelli seeks are beyond the scope of the agreement. I reject the Village's conclusory defense that Iovinelli has other remedies, and I deny the Village's motion to dismiss on this ground.

### D. Respondeat Superior

The Village argues that it should be dismissed as a party to this case because a government entity cannot be held liable for § 1983 claims under a theory of respondeat superior. *Palmer v Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). However, the Village can be held liable if "the deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Bd. of Comm'rs of Bartholomew County*, 183 F.3d 734, 737 (7th Cir. 1999). Unconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Rasche v. Village of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003).

In order to have policymaking authority, an official must possess "[r]esponsibility for making law or setting policy," that is, "authority to adopt rules for the conduct of government." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). At this juncture, Iovinelli has alleged that Traiforos and Pritchett were final policymakers in regard to the selection of shift commanders, and other officer assignments and generally the terms and conditions of employment for all firefighters in the Department. The evidence submitted sufficiently supports the conclusion that

19

Traiforos and Pritchett have the requisite policymaking authority to confer liability upon the Village.

    E.  Statute of Limitations

       Defendants claim that Iovinelli's allegations of constitutional violations that occurred prior to November 22, 2004 are time barred by the statute of limitations.[5]  A two-year statute of limitations applies to § 1983 claims in Illinois.  745 Ill. Comp. Stat. Ann. 10/8-101 (2008); *Licari*, 298 F.3d 664, 667-68 (7th Cir. 2002).  Such claims accrue when the plaintiff knows or should have known that his constitutional rights were violated.  *Id.*

---

[5]The following timeline of events is helpful to the analysis here.  The text in **bold** indicates the alleged retaliatory actions.

Fall 1998 - Iovinelli urges the Pension Board to take action to cure the underfunding

**September 2001 - Iovinelli removed as training officer**

January 30, 2002 - Iovinelli files lawsuit in the Circuit Court against the Village

**June 2003 - Iovinelli denied the promotion to shift commander at Station 3**

August 31, 2005 - Partial summary judgment granted for plaintiffs in the pension fund lawsuit

**September 2005 - Iovinelli elevated to interim command and summarily demoted about 10 days later, allegedly after Pritchett learns of the judgment entered in the pension fund case**

**December 2005 - Iovinelli stripped of responsibilities normally associated with his rank (payroll, personnel, scheduling) and threatened with further demotion**

August 28, 2006 - Final decree entered in the pension fund case

**September 2006 - Two weeks after the final decree Traiforos announced Iovinelli's transfer to Station 3, effective January 1, 2007**

November 22, 2006 - Iovinelli files federal lawsuit seeking redress for alleged constitutional violations

Iovinelli argues that his § 1983 claims arising out of actions that occurred prior to the statutory period are not barred due to the application of the continuing violation doctrine. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The foundation of the continuing violation doctrine is the premise that equity requires the statute of limitations not begin to run until a person is or should be aware that his or her rights have been violated. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994) (*citing Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1415 n.6 (10th Cir. 1993)). Thus, acts that fall outside the statute of limitations may be joined to an act within the statute only if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that he had a claim. *Galloway v. General Motors Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996). If a plaintiff could only tell by hindsight that the untimely acts represented the early stages of his claim, then those untimely acts will not be barred. *Id*.

There are three viable continuing violation theories or situations. *Selan*, 969 F.2d at 565. Iovinelli admits that the first theory, which usually involves hiring or promotion practices and an employer's decision-making process over a period of time, does not apply here. The second theory arises out of cases in which the employer has an express, openly espoused policy that is alleged to be discriminatory. *Id*. Iovinelli alleges that Pritchett's blatant declaration that Iovinelli will "never" be appointed shift commander, regardless of his qualifications, fits this second theory of express and openly espoused discrimination. However, the second theory has applied

exclusively in cases where the alleged discrimination involves a particular class of people, and not an openly discriminatory policy by one individual against another. *See Palmer v. Bd. of Educ. Comm. Unit Sch. Dist. 201-U*, 46 F.3d 682, 686 (7th Cir. 1995) (continuing violation based on a theory of racial discrimination); *Selan*, 969 F.2d at 565 (no continuing violation because no allegation of an openly espoused policy of discriminating against older workers); *Stewart v. CPC Int'l, Inc.*, 679 F.2d 117, 121 (7th Cir. 1982) (stating that *Bartmess v. Drewrys U.S.A., Inc.*, 444 F.2d 1186 (7th Cir. 1971) typified second continuing violation theory where employer mandated differed retirement ages for men and women). Thus, the second theory does not apply.

The third theory applies when the employer's hostility or discrimination is practiced continuously, but covertly, rather than by way of an open notorious policy. *Selan*, 969 F.2d at 565. Iovinelli argues that discovery is needed to reveal what Pritchett was saying and doing behind the scenes to undermine Iovinelli's career throughout the period of alleged retaliatory events. Iovinelli's theories are somewhat confused. On the one hand, he argues that Pritchett had an express discriminatory policy against him, and on the other, he argues that discovery is needed to uncover Pritchett's more covert tactics.

The continuing wrong theory has been used in discrimination cases under Title VII, *Stewart*, 679 F.2d 117, and medical malpractice litigation. *See, e.g. Baughman v. Bolinger*, 485 F.Supp. 1000, 1002 (D. Ohio 1980); *see also Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983) (applying the doctrine to ongoing copyright infringement). The theory, however, is not suited to cases such as this, where the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress. "The exception as to continuing, ongoing acts

does not apply where the alleged tortious acts . . . caused direct damages that occurred at a certain point in time-resulting in immediate and direct injury . . . with consequential effects." *Wilson v. Giesen*, 956 F.2d 738, 743 (7th Cir. 1992) (*quoting* S. Speiser, C. Krause & A. Gans, *The American Law of Torts*, § 5:27 at 890 (1983)).

In the final analysis, Iovinelli's claims that he was removed as training officer in September 2001 and denied the promotion to shift commander in June 2003 may not be linked together with the subsequent incidents since, "any reasonable person in [plaintiff's] situation would have realized that [Iovinelli] had a substantial claim under the law." *See Galloway*, 78 F.3d at 1166. It is clear from Iovinelli's complaint that he was immediately aware of the alleged retaliatory acts perpetrated against him. He describes feelings of shock and humiliation when he was removed from the position of training officer and when he was passed over for the promotion to shift commander. Iovinelli argues that he was prevented from seeking immediate redress by "powerful indications" that he would be the next firefighter promoted to shift commander, *i.e.*, alleged admonishments issued to Pritchett by the Village attorney, his excellent performance evaluations, and the mutually-explicit understanding that the senior ranking officer would receive the promotion. Based on Iovinelli's own allegations, the delay in filing a claim, therefore, was not the result of a covert pattern of discrimination that prevented him from realizing he had a claim under the law, but was instead based upon his hopes that if he didn't complain he might be next in line for the promotion. This does not fit the continuing violation theory.

The gap in time between the alleged retaliatory actions also precludes a finding that this is a case of continuing violation. A two-year lull is a considerable separation between acts that

weighs against finding a continual violation.  *Garrison v. Burke*, 165 F.3d 565, 570 (7th Cir. 1999).  Iovinelli was removed as training officer in September 2001; almost two years later (June 2003) he was denied the promotion to shift commander, and more than two years after that (December 2005) he was stripped of other responsibilities normally associated with his rank (payroll, personnel, scheduling).  Thus, there was over a four-year delay between Iovinelli's removal as training officer and the oldest occurring event within the limitations period and a two and a half year delay associated with the denial of promotion in 2003.  The separation between these events indicates that Iovinelli was not subject to "continual unlawful acts," *see Diliberti v. United States*, 817 F.2d 1259, 1264 (7th Cir. 1987), but rather "discrete, isolated, and completed acts which must be regarded as individual violations."  *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d at 446 (quotation omitted).

This case commenced on November 22, 2006, and therefore Iovinelli is barred from seeking relief for claims that occurred before November 22, 2004, including being denied the position of shift commander in 2003 and his removal as training officer in September, 2001.

F.  Iovinelli's First Amendment Claim (Count I)

In Count I Iovinelli alleges a federal civil rights violation under 42 U.S.C. § 1983, claiming that Defendants violated his rights guaranteed by the First Amendment when they allegedly retaliated against him for exposing the Village's illegal practices regarding the financing of the Fund - all in the context of the Circuit Court litigation.  Iovinelli clarifies that the First Amendment activity in this case falls within the petition clause, not the speech or association clauses.  The activity here was Iovinelli's initiation of and participation in the pension fund litigation against the Village.  The right to participate as a party to litigation seeking to

24

remedy an infringement of constitutionally-guaranteed or other legal rights has traditionally been considered an aspect of the freedom to petition the government for a redress of grievances protected by the first amendment. *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

In general, the First Amendment provides protection for a public employee's right to speak as a citizen about matters of public concern under certain circumstances. *Sigsworth v. City of Aurora, Ill*, 487 F.3d 506, 508 (7th Cir. 2007) (*citing Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  Indeed, government employees do not lose the right to comment as citizens on matters of public concern as an incidence of their employment. *City of San Diego v. Roe*, 543 U.S. 77 (2004).  But, equally well-established is the principle that government employees do not enjoy unlimited freedom of expression with regard to matters that relate to their official responsibilities.

The traditional analysis for these cases begins with the balancing test first announced in *Pickering v. Board of Education* and clarified in *Connick v. Myers* and its progeny. *Sigsworth*, at 509.  Under the *Connick-Pickering* test, a public employee can establish that his speech is constitutionally protected if (1) the employee spoke as a citizen on a matter of public concern, and (2) the interest of the employee as a citizen in commenting on a matter of public concern outweighs the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees. *Sigsworth*, at 509.  In 2006 the Supreme Court clarified the threshold legal inquiry in First Amendment retaliation claims made by public employees holding: "when public employees make statements pursuant to their official duties,

the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. *Garcetti* made clear that public employees are not protected by the First Amendment for retaliation unless they were disciplined for speaking as *citizens* about a matter of public concern. *Spiegla v. Hull*, 481 F.3d 961, 963 (7th Cir. 2007). When public employees make statements pursuant to their official duties, "the Constitution does not insulate their communications from employer discipline," regardless of the content of their speech. *Id*. at 964-65.

However, the Seventh Circuit has also recognized a policy-maker corollary to the *Connick/Pickering* analysis under which the First Amendment does not prohibit the discharge of a policymaking employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies. *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 971 (7th Cir. 2001) (*citing Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995); *Wilbur v. Mahan*, 3 F.3d 214, 219 (7th Cir. 1993)). Pursuant to this exception, political affiliation is an appropriate criterion for public employment when the effective operation of government would be compromised by requiring a public official to retain a potential political enemy in a position of responsibility. *Warzon*, 60 F.3d at 1239. In cases involving policymaking public employees, the *Pickering* analysis will consistently result in a determination that the interest of the State as an employer in promoting efficiency - and the need for political allegiance from its policymaking employees in doing so - outweighs the employee's freedom of expression, thus obviating the need for *Pickering* balancing. *Vargas*, at 971.

Whether a case falls within the ambit of the policy-making corollary depends on whether or not the public employee occupied a policy-making position, and whether his speech was the

kind that falls within the scope of the corollary. According to the Seventh Circuit, a policy-making employee is one whose position "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981).

Not all policymaking public employees who complain of First Amendment retaliation will be subject to the policymaker exception, because the content of the speech in issue figures into the analysis. When the speech addresses matters that have no impact on the employee's official duties, there is a diminished threat to the government's performance of its functions. *Vargas*, at 973. The policymaking employee exception does not apply when the speech at issue does not implicate the employee's politics or substantive policy viewpoints. *Bonds v. Milwaukee County*, 207 F.3d 969, 979 (7th Cir. 2000). In *Bonds*, even though the employee conceded his status as a policymaker, the policymaking exception did not apply because the County did not decide against Bonds for the political viewpoint of his speech, but rather because Bonds' speech evidenced shortcomings of trustworthiness, propriety, and loyalty to his employer. *Id*. at 977-78. Bonds' speech did address a controversial issue in a political setting, but the County did not decide against him for the political viewpoint of his speech. *Id.* at 979. Bonds' prospective government employer was less concerned with the substantive viewpoint he expressed and more with the public forum in which he chose to express it. *Id*. at 978-79. Because Bond's job offer was not withdrawn for "political reasons," the court applied *Pickering* balancing rather than the policymaking exception.

The kind of speech that falls within the scope of the corollary includes most obviously partisan affiliation, *see Elrod v. Burns*, 427 U.S. 347, 367 (1976), but the exception has been

extended to cover employer action against political expression, *Wilbur*, 3 F.3d 214, and also

viewpoints relating to the policymaking employee's duties. *Warzon*, 60 F.3d 1234. In *Wilbur*,

the deputy sheriff, a policymaking employee, who was placed on unpaid leave after announcing

his intention to run against the sheriff in an upcoming election did not establish a violation of his

First Amendment rights. The deputy sheriff's declaration of his candidacy was akin to "a

declaration of war," making the deputy sheriff a political enemy of his boss, even though they

belonged to the same political party. *Wilbur*, 3 F.3d at 218. In *Warzon*, the termination of a

policymaking employee, whose duties included management of the Milwaukee County health-

care plan and who openly challenged her superior's health-care policy positions, did not violate

the First Amendment. 60 F.3d at 1240. The Seventh Circuit decided that a government employer

can punish policymakers who disagree with the employer's job-related policy. *Id.*

Defendants contend that this case should be analyzed under the political patronage cases

derived from *Elrod* and *Branti* instead of under *Connick/Pickering* balancing. But the

relationship between the two types of cases is not implicated here. The difficult cases are those

in which an employee's speech reflects his or her political associations, for instance when an

employee campaigns against or openly supports a political candidate whose beliefs are adverse to

the employee's superior.

Iovinelli was not running for office, nor was he attempting to oust one of his superiors

with someone of his political beliefs. Iovinelli did not dispute any of the Department's operating

procedures or policies. His concerns were unrelated to department training, staffing, or protocol.

Iovinelli spoke out and filed a lawsuit against the Village for its failure to properly remit

payments to the Pension Fund. He challenged the Village's activities that resulted in an alleged

misuse of public funds and trust. His criticisms were not employment disputes or challenges to the way that only his job was affected. The facts alleged simply do not suggest that Iovinelli was subject to retaliatory acts as a result of partisan politics. *See Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1220 (7th Cir. 1994). In *Marshall*, the plaintiff complained about her supervisor's inappropriate claims for excessive mileage reimbursements, his involvement in partisan political activity during county time, his failure to conduct required inspections, and for violations of the Indiana open door meeting law. *Id.* at 1221. The Seventh Circuit declined to apply the policymaker corollary, recognizing the difference between political speech and speech which exposes a breach of the public trust, the latter of which was implicated in that case and which falls under the ambit of First Amendment protection.

There is also no suggestion that cause existed to strip Iovinelli of the responsibilities normally associated with his rank, or to transfer him to Station 3. Indeed, no reason is suggested as to why these degradations and demotions took place, especially in light of Iovinelli's outstanding service to the Department, other than Pritchett's animosity toward him stemming from Iovinelli's involvement in the pension fund litigation. There are no facts shown, other than Iovinelli's assiduous pursuit of the pension fund litigation, to mark Iovinelli as insubordinate, or otherwise to render him unfit to remain in his regular assignment at Station 2. In short, it is undisputed - indeed, conceded - that Iovinelli, a 27-year veteran of the Department (and without, so far as appears, any pertinent history of misconduct whatsoever) was reassigned solely on the basis of his involvement in the pension fund litigation. I find, on the record as it stands, that Iovinelli's summary reassignment was punitive, and was taken in retaliation for his pursuit of the lawsuit against the Village for its underfunding practices.

Furthermore, although the purpose of the policymaker exception to the Constitution's ban on patronage dismissals - to promote the public interest by enhancing the effectiveness and efficiency of a unit of local government - may have been served by Iovinelli's dismissal, it is not served "by a campaign of petty harassment that generally makes it more difficult for [Iovinelli] to do his job, even if the ultimate goal . . . is to prompt [his] resignation." *Wallace v. Benware*, 67 F.3d 655, 663 (7th Cir. 1995). Taking away duties that were normally associated with Iovinelli's rank, especially when he proved to be more than adept at completing them diligently, does not serve the public interest by enhancing the effectiveness of the Department. Similarly, the punitive transfer to Station 2 may marginally enhance the efficiency at that station, but given that his skills will no doubt be largely underutilized at that location, in the aggregate a detriment has been conferred to the Department.

For these reasons, Iovinelli's alleged position as a policymaker does not prompt the application of *Elrod* and *Branti*.[6] Instead, I apply the balancing test advanced in *Pickering* and *Connick*.

Taking the facts in a light most favorable to Iovinelli, as I must, the content of the speech at issue covers more than a dispute over internal office affairs, and would be of legitimate news interest. Beyond this blanket observation, I review the precise context of Iovinelli's speech. Speech alleging government malfeasance addresses matters of public concern in its substance. *Miller v. Jones*, 444 F.3d 929, 936 (7th Cir. 2006) (*citing Spiegla v. Hull*, 371 F.3d 928, 937 (7th

---

[6]I do not reach the factual question of whether or not Iovinelli was a policymaker because it is not the determinative question in this case. The content of Iovinelli's speech alone precludes Defendants' attempt to bring the speech at issue here within the contours of the policymaker corollary.

Cir. 2004)).  The pension fund litigation and issues giving rise to its inception were clearly

matters of public concern.  Iovinelli raised questions that touch on the propriety of fiscal

management by government officials that were not, as in *Schad*, limited to ordinary matters of

purely internal operation.  *See Schad v. Jones*, 415 F.3d 671 (7th Cir. 2005).  The citizens of

Franklin Park have an interest in the tax levying and remittance functions that were reviewed in

the pension fund case.  The Circuit Court noted the public interest served by the litigation, and

those observations remain true regardless of whether the underfunding was due to technical or

intentional violations.  The benefit conferred (namely a permanent decree directing the Village to

comply with the pension fund statute in perpetuity) to the Franklin Park firefighters, their

dependents, as well as the Village taxpayers whose future tax burdens were at stake was not

insignificant.

The form of Iovinelli's speech also indicates that the matter was one of public concern.

After raising his concerns with other members of the Board, including the individual Defendants

named here, he filed a civil action in the Circuit Court of Cook County.  This public form of

communication stands in marked contrast to the internal memos circulated in *Connick* or

*Gonzales*, or the procedural officer-to-officer call placed in *Schad*.  *See Gonzales v. City of

Chicao*, 239 F.3d 939 (7th Cir. 2001).  Iovinelli's actions explicitly and formally sought to alert a

greater audience of the possible harm at issue.  *See Miller v. Jones*, 444 F.3d at 937.

Finally, I consider the context of Iovinelli's speech, including his motive and

circumstances.  *See Schad*, 415 F.3d at 676.  While a statement born of pure personal interest

does not constitute a public concern, a mere personal aspect of the speaker's motivation will not

defeat the entire speech.  *See Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999).  While

there was certainly some personal aspect to Iovinelli's concern over funding of the pension fund because he is a direct beneficiary, it was hardly in Iovinelli's personal interest to antagonize Pritchett and other ex officio members of the board who clearly were opposed to his efforts. Contrary to what Defendants argue, the pension fund lawsuit filed in Circuit Court was not "a tool used to advance [Iovinelli's] career." Taking as true Iovinelli's allegations, his motivations for filing the lawsuit were far less personally motivated; the design of the lawsuit was to address a matter of public concern.

Defendants claim that Iovinelli's statements are not protected because they were within the scope of his regular job duties. *See Garcetti*, 547 U.S. at 421. But, where, as here, the speech at issue arose from a discretionary act involving independent judgment and action, the speech is more likely to suggest the employee spoke as a citizen on a matter of public concern. *Miller*, 444 F.3d at 937 (*citing Delgado v. Jones*, 282 F.3d 511, 519 (7th Cir. 2002) (limiting *Gonzalez* to routine discharge of assigned functions where there is not suggestion of public motivation). This case is analogous to *Delgado* in that Iovinelli's responsibilities on the Board may have in some measure overlapped with his motivations as a well-meaning citizen. And, as in *Delgado*, such overlap does not change the analysis that Iovinelli was speaking as a citizen on a matter of public concern. Moreover, the controlling factor in *Garcetti* was that the employee's expressions were made pursuant to his duties as a calendar deputy. 547 U.S. at 421. ("Ceballos does not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor'"). In this case, Iovinelli's petition to the Circuit Court was not made pursuant to his duties as a firefighter in the Department nor as a trustee of the Pension Board. Instead, as the orders from the Circuit Court made clear, Iovinelli and Horn derived standing to sue the Village by virtue of

their status as pension fund participants and beneficiaries.  Moreover, the duties of a pension

board trustee do not include suing a noncompliant municipality at one's own expense if the board

declines to sue in its own right.  When Iovinelli was unable to cure the perceived financing

deficiencies through whatever influence he had as a trustee, he acted as a citizen on a matter of

public concern and pursued the matter in the Circuit Court.

For all of these reasons, I find that Iovinelli has satisfied the first part of the

*Connick/Pickering* analysis that his speech addressed a matter of public concern, which is all he

needs to do at this stage to establish a viable First Amendment claim under the petition clause.

*See Gustafson*, 117 F.3d at 1019.  The full *Pickering* balancing factors are not addressed in the

parties' briefs on the issues currently before me.  *See Caruso v. De Luca*, 81 F.3d 666, 670 (7th

Cir. 1996) (listing factors).  Therefore the application of the *Pickering* balancing test will be

possible only after the parties have had an opportunity to conduct some discovery.  *Id.*

Iovinelli has alleged sufficient facts to establish that his speech is constitutionally

protected and that the Defendants retaliated against him because of this.  Therefore, his

complaint states a valid First Amendment retaliation claim.

G.  Iovinelli's Due Process Claims (Count II)

*1.  Due Process Property Rights*

First, Iovinelli claims he has a constitutionally protected property interest in being

promoted to the rank of shift commander because of the mutually-explicit understanding between

the Department and the final policy-making officials of the Village that the senior officer in grade

will automatically be promoted to that position when an opening occurs.  Iovinelli alleges that

when he was denied the promotion in 2003, Defendants failed to afford him a hearing or other

fair process by which he could attempt to obtain the rank he believed he was entitled to. Iovinelli claims that the process of soliciting applications from more junior members of the Department was a sham because it was solely devised to achieve Pritchett's retaliatory ambitions against Iovinelli.

Second, Iovinelli claims he has a constitutionally protected property interest in being assigned the job responsibilities normally associated with his rank.

To establish a due process violation, Iovinelli must show: (1) the existence of a constitutionally protected property interest, (2) that he suffered a loss amounting to a deprivation of that interest, and (3) that the deprivation occurred without due process of law. *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Due process only entitles an employee to notice and a legitimate opportunity to respond before an unbiased adjudicator. *Greer v. Amesqua*, 212 F.3d 358, 368 (Wis. 2000) (*citing Schacht v. Wisconsin Dep't of Corrections*, 175 F.3d 497, 503 (7th Cir.1999)). Grievance procedures created by collective bargaining agreements can satisfy the requirement of due process of law. *Hudson v. City of Chicago*, 374 F.3d 554, 563 (7th Cir. 2004)*; Cushing v. City of Chicago*, 3 F.3d 1156, 1161 (7th Cir. 1993).

Regarding Iovinelli's first claim, I have already determined that statute of limitations bars him from seeking relief for the denial of the promotion to shift commander in 2003. He has yet to be denied any further promotion within the statutory period. Therefore I do not address the merits of that due process argument.

Regarding the claimed due process property rights in the duties and responsibilities that were removed from Iovinelli's oversight, the job duties at issue are not listed in the job description for lieutenant in the Rules and Regulations or in the Collective Bargaining

Agreements. As such, they were not assigned to Iovinelli in accordance with his job description but rather doled out as discretionary duties. Iovinelli does not possess a property interest in such discretionary duties, which may be freely revoked just as they are freely given. Because Iovinelli cannot establish a prima facie case, his due process claim to the duties and responsibilities that were removed from his oversight is dismissed.

### 2. Occupational Liberty Interest

Iovinelli does not allege a liberty interest in the promotion to shift commander, but he does claim to have a liberty interest in "being immune from compulsory job assignments that are retaliatory and far beneath his earned rank and previous duties" and "in being immune from false statements by public officials which impugn his character and leadership abilities." As a result of the claimed retaliation, Iovinelli alleges he is not free to seek alternative employment at an equivalent rank because lateral transfers rarely if ever occur at this level in the fire service. He bases this part of his claim on the concept of "liberty of occupation." *See* Madison, *Essay on Property*, in 6 Madison, Writings 101 (Hunt ed. 1906 (1972)) (the concept of liberty of occupation goes back to the eighteenth century); *Altman v. Hurst*, 734 F.2d 1240, 1243 (7th Cir. 1984) (even the loss of one's job does not amount to a deprivation of liberty so long as a person remains able to locate alternate employment).

In order to state a claim for deprivation of a liberty interest based on stigmatization, a plaintiff must allege that (1) he was stigmatized by the defendant's conduct; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Johnson v. Martin*, 943 F2d 15, 16 (7th Cir. 1991).

Iovinelli's claimed right to liberty of occupation does not translate into a "right to a specific job." *Lucas v. Village of La Grange*, 831 F.Supp. 1407, 1412 (N.D. Ill. 1993). The Seventh Circuit's reasoning in *Bigby* - a case that involved a denials of promotions at a police department - is particularly insightful here:

> To be a policeman is to follow a particular calling, and to be excluded from that calling is an infringement of liberty of occupation. But a particular rank in the police force is not an occupation, just as the army is not a series of separate occupations . . . just as the private practice of law is not composed of two occupations - partner and associate. . . . But ranks within an occupation . . . are not "occupations" themselves; and while preventing someone from advancing in his occupation can be a cruel deprivation, it would stretch the idea of liberty of occupation awfully far . . . to treat a bar to a promotion as a deprivation of that liberty.

*Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985). Iovinelli was not fired from the Department and he has not proved that he suffered a tangible loss of other employment opportunities as a result of any alleged publicly made statements that impugned his character and leadership abilities. Rather, his Second Amended Complaint alleges that he currently serves as part-time deputy chief of the River Grove Fire Department. He also currently remains as acting shift commander at Station 3 in the Franklin Park Fire Department. Under these facts, to find that Iovinelli has been deprived of his liberty of occupation would similarly stretch that right further than is justified under the law. Therefore, this claim is dismissed.

*3. Substantive Due Process*

Lastly, Iovinelli asks me to examine whether he has sufficiently stated a substantive due process claim.[7]  The scope of substantive due process is very limited and protects plaintiffs only against arbitrary government action that "shocks the conscience." *Montgomery v. Stefaniak*, 410 F.3d 933, 939 (7th Cir. 2005) (*quoting Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005)). Iovinelli has pointed to very few facts and no cases to support a substantive due process argument.  At best, this claim is a re-characterization of his First Amendment-retaliation claim, which is appropriately addressed in Count I.  Therefore, this claim is dismissed.

H.  Iovinelli's Equal Protection Claim (Count III)

Iovinelli's equal protection claim alleges he is a member of a vulnerable class of public employees who have spoken out on matters of public concern and faced differential and retaliatory treatment as a result that was not rationally related to any legitimate governmental interest.

To state a *prima facie* claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that (1) he is otherwise similarly situated to members of the unprotected class; (2) he was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 944-45 (7th Cir. 1996).

Iovinelli's claim fits uneasily into an equal protection framework.  Normally, the Equal Protection Clause forbids the making of invidious classifications - classifications on the basis of

---

[7]I say "asks me" because he did not allege a violation of substantive due process in his Second Amended Complaint but instead raised the argument for the first time in his response briefing.

such characteristics as race, religion, or gender. Here, Iovinelli is not claiming that he was classified on the basis of some forbidden characteristic, only that he was treated differently because he exercised his constitutional rights under the First Amendment. At best, this argument can also be characterized as a mere rewording of Iovinelli's First Amendment-retaliation claim, which is properly addressed in another count of his complaint. *See Vukadinovich v. Bartels*, 853 F.2d, 1387, 1391-91 (7th Cir. 1988). Therefore, Count III is dismissed.[8]

I.  Qualified Immunity

With respect to the individual capacity claims, Traiforos and Pritchett argue that they are entitled to qualified immunity from suit. Indeed, public officials performing discretionary functions are entitled to qualified immunity from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Erwin v. Daley*, 92 F.3d 521, 525 (7th cir. 1996). Accordingly, after establishing that Iovinelli has adequately alleged a violation of a constitutional right, the second level of inquiry in the analysis of qualified immunity involves whether the law was "clearly established" at the time of the alleged violation. Traiforos and Pritchett have no valid argument on this front. "It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular retaliation through a transfer to a less desirable position." *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997). The pleadings here show

---

[8]I note that supplemental authority was submitted on the class-of-one theory of equal protection. Although the precise issue was not briefed by the parties, it is clear that the class-of-one theory does not apply in the public employment context. *See Engquist v. Oregon Dep't of Agric.*, 128 S.Ct. 2146, 2151 (2008).

that the speech was on a matter of public concern and that the decisions to remove several of Iovinelli's administrative duties and to transfer him to Station 3 were retaliatory in nature. Under these circumstances, it would be premature to find qualified immunity for the individual Defendants.

## V. CONCLUSION

For the foregoing reasons, Defendants' motions are denied with respect to Count I and granted with respect to Counts II and III. Because Plaintiff has alleged a valid claim of retaliation under the First Amendment, Defendants' motions with respect to Counts IV and V (claims for injunctive relief) are denied.

ENTER:

James B. Zagel
United States District Judge

DATE: July 9, 2008